**Eloise WASHINGTON, et al., Plaintiffs-Appellants,**

v.

**TENSAS PARISH SCHOOL BOARD, et al., Defendants-Appellees.**

**No. 86–4488.**

United States Court of Appeals, Fifth Circuit.

June 23, 1987.

Rehearing and Rehearing En Banc Denied July 29, 1987.

Benjamin Jones, Jones and Smith, Monroe, La., for plaintiffs-appellants.

John D. Crigler, Asst. Dist. Atty., St. Joseph, La., James D. Caldwell, Dist. Atty., Tallulah, La., for defendants-appellees.

Before POLITZ, JOHNSON, and DAVIS, Circuit Judges.

POLITZ, Circuit Judge:

Invoking the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1973, *et seq.*, the fourteenth and fifteenth amendments, and 42 U.S.C. §§ 1981 and 1983, plaintiffs-appellants challenged the apportionment of Tensas Parish, Louisiana, for purposes of electing members to the school board and the Police Jury, the parish governing authority. The district court received reapportionment plans submitted by the plaintiffs, the defendants, and by a special master it had appointed. The court accepted the plan prepared by the special master. Finding that plan to be constitutionally and statutorily sound, we affirm.

*Background*

Tensas Parish is a small, predominantly rural parish abutting the Mississippi River in northeast Louisiana. Historically, blacks were discouraged from voting and running for office. That unfortunate racial debasement no longer exists, but there remains what might be considered a vestige, racially polarized voting.

In 1978, responding to the one person/one vote mandate of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the court ordered the parish divided into seven single-member districts for election of police jury and school board members. Four of the districts were majority white and three were majority black in three relevant enumerations: the number of registered voters, the voting age population, and the total population. In subsequent elections, candidates from the majority race have consistently won elections.

The 1980 census revealed a total population of 8,525 and malapportionment requiring redistricting to regain the required electoral balance. The parish population was 54.65% black and 45.23% white. By 1985, the percentage of blacks had shifted slightly to 54%. The 1980 voting age populations were almost equal, 50.5% black and 49.5% white. The 1986 voter registration

statistics reflect, however, that the qualified electorate parishwide was 51.4% white and 48.6% black.

When the responsible legislative bodies failed to reapportion pursuant to the 1980 census results, the instant suit was filed. As noted, the court adopted the reapportionment plan submitted by a special master. Appellants challenge the constitutionality of that plan and seek adoption of the plan they submitted.

The special master's plan and that submitted by the plaintiffs both propose seven districts, with a median population of 1,217. The proposals are identical with regard to Districts One through Five. The dispute at bar involves Districts Six and Seven, basically the town of Waterproof, which is largely black, and the surrounding rural area, which is largely white. District Six, as adopted by the court, consists of the rural area, plus a small number of blacks and whites within the town limits of Waterproof. District Seven comprises the remainder of Waterproof.

Plaintiffs would include in District Six more of the black population of Waterproof and thus people four of the districts with a clear black majority in all three relevant populations. Specifically, plaintiffs would shift the district lines so that District Six would contain a sufficient portion of the black population of Waterproof to render the district 60% black, giving plaintiffs what they consider a "safe" district. The deviation from the median population under the special master's plan is 2.2 percent; under plaintiffs' proposed plan the deviation is 3.5 percent.

The district court chose the special master's plan as the basis for its reapportionment decree, finding that it did not dilute black voting strength and accomplished a fair reapportionment of the parish, considering, *inter alia*, natural, historic and geographical boundaries, population demographics, and existing district configurations.

### Discussion

■ Our task on appeal is to review the constitutionality and statutory validity of the reapportionment plan ordered by the district court. To pass muster, the plan must conform to constitutional mandates and the legislative directives contained in the Voting Rights Act. The plan must comply with the one person/one vote requirement, and must assure that the vote of minorities will not be unfairly diluted. 42 U.S.C. § 1973; *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151 (5th Cir. 1981); *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973), *aff'd sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). In constructing an apportionment plan the court is to give appropriate consideration to historic political units and to natural, historic, and geographic boundaries. *Wyche*, 635 F.2d at 1158.

There is no question that the court-approved plan fully complies with the one person/one vote rubric. Nor is there any suggestion that the accepted plan disrupts historical, geographic, or political boundaries. To the contrary, these factors were given full measure. Nevertheless, plaintiffs contend that the plan dilutes black voting strength in Tensas Parish. They reason that because blacks constitute 54% of the total parish population, four of the seven districts should be majority black and thus "safe" for black candidates.

■ Whether racial voter dilution does or does not exist is a question of fact for the trier of fact. The district court's finding in that regard is protected by the clearly erroneous shield of Fed.R.Civ.P. 52(a); *Thornburg v. Gingles*, — U.S. —, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *Velasquez v. City of Abilene*, 725 F.2d 1017 (5th Cir. 1984). In *Thornburg*, the court stated:

We reaffirm our view that the clearly-erroneous test of Rule 52(a) is the appropriate standard for appellate review of a finding of vote dilution. As both amended § 2 and its legislative history make clear, in evaluating a statutory claim of vote dilution through districting, the trial court is to consider the "totality of the circumstances" and to determine, based "upon a searching practical evaluation of the 'past and present reality,'" S Rep 30

(footnote omitted), whether the political process is equally open to minority voters. " 'This determination is peculiarly dependent upon the facts of each case,' " *Rogers* [v. Lodge, 458 U.S. 613], supra, at 621, 73 L Ed 2d 1012, 102 SCt 3272 [at 3277], quoting *Nevett v. Sides,* 571 F2d 209, 224 (CA5 1978), and requires "an intensely local appraisal of the design and impact" of the contested electoral mechanisms. 458 US, at 622, 73 L Ed 2d 1012, 102 S Ct 3272 [at 3278].... Thus, the application of the clearly-erroneous standard to ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law.
—— U.S. at —— - ——, 106 S.Ct. at 2781–82, 92 L.Ed.2d at 64–65.

■ We perceive no error in the district court's finding that the adopted plan does not dilute the black vote in Tensas Parish. Under that plan, the three town districts, Two, Five, and Seven, have a majority of black voters and the country districts, One, Three, and Four, have a majority of white voters. The seventh district approaches an equal division, with 52% white and 48% black voting age populations. If voter registration practices of the past continue and, to the credit of neither blacks nor whites, if election contests continue to be embarrassingly racially polarized, District Six will likely send white representatives to the police jury and school board. But that embarrassment, antithetical to our democracy, is not set in stone and, regardless, does not constitute proscribed racial vote dilution.

■ In claiming constitutional or statutory entitlement to four racially "safe" districts, plaintiffs misperceive the Constitution and statutes. Neither our written law nor the construct of our constitutional republic assures any race, or otherwise identifiable voting group, strict proportional representation. *Marshall v. Edwards,* 582 F.2d 927; *Wyche v. Madison Parish Police Jury.* Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(b), specifically negates that proposition as it declares: "Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *See White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Nevett v. Sides,* 571 F.2d 209 (5th Cir.1978), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980). Appellants' argument that the recent decision in *Thornburg v. Gingles,* changes this principle is unpersuasive. The teachings of this court in *Marshall v. Edwards,* 582 F.2d at 937, still appertain: in drawing constitutionally and statutorily acceptable districts, the court should adhere to considerations of "compactness, contiguousness and the preservation of boundaries," and the court should not post as its primary goal "racially balanced representation." And again, "[a]lthough some democracies provide for proportional representations of parties and ethnic groups, [that] has never been an American tradition." *Id.* at 934–35. As we stated in *Wyche v. Madison Parish Police Jury,* "while race may be considered as a factor, safe seats for the minorities are not required of a reapportionment plan." 635 F.2d at 1161.

The historical tensions between the races in Tensas Parish, albeit ameliorated, have not disappeared. It is the responsibility of both races that those tensions now abate. It is fervently hoped that District Six will provide the occasion for the final rejection of regrettable legacies of the past and the nurturing of more worthy legacies for the future.

The judgment of the district court is AFFIRMED.