Eugene BRYANT, et al., Plaintiffs,

v.

LAWRENCE COUNTY, MISSISSIPPI, et al., Defendants.

Civ. A. No. 2:91cv152 (P)(N).

United States District Court,
S.D. Mississippi,
Hattiesburg Division.

March 3, 1993.

Ellis Turnage, Cleveland, MS, for plaintiffs.

Malcolm Rogers, Monticello, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

PICKERING, District Judge.

In the above styled nonjury case, the Court heard testimony for two days on October 20 and 21, 1992, and then from the bench ordered that a bi-racial committee be formed to try to resolve this matter. The Court reserved ruling on this matter for forty days

in hopes that this matter would be resolved by the citizens of Lawrence County; the Committee was unable to reach a solution acceptable to the parties.[1] The Court had the parties back for a status conference, however, the parties still did not resolve this matter. After careful consideration of all of the evidence presented at trial, oral arguments of the parties and the briefs submitted on behalf of each party, this Court finds as follows:

## FACTUAL BACKGROUND

In 1984, black citizens brought a voting rights action against Lawrence County, which resulted in a compromise submitted to and pre-cleared by the Justice Department. Although the parties thought that District 5 of Lawrence County, as agreed to, had an overall black population of 57.9%, it only had an overall black population of approximately 54.4%. *See* Defendants' Exhibits 3 and 4. On July 31, 1991, the present action was filed challenging the 1984 Plan. The 1984 Plan was challenged on the basis of (1) one-man, one-vote, and (2) Section 2 of the Voting Rights Act. On or about August 26, 1991, Lawrence County submitted to the Justice Department for pre-clearance a new plan. On September 5, 1991, just twelve days before the regular quadrennial primary was

held, the Plaintiffs filed a Motion for Preliminary Injunction, which was not otherwise pursued. This motion was filed well after the deadline for qualifying for office and during the middle of quadrennial campaigning. No request was made for a hearing on the Motion for a Preliminary Injunction.

Although District 5 had an overall black population of some 54.4%, a 50.5% black voting age population, and had a black candidate for supervisor, a white candidate was elected Supervisor in that beat. Well after the election was over, in July, 1992, the Plaintiffs amended their complaint to challenge the 1991 Plan. This Plan was pre-cleared by the Justice Department on August 10, 1992. The new pre-cleared plan establishes one clear black majority district (i.e., District 5, with a 65.2% total black population and with a 60.5% black voting age population) and two impact districts (i.e., District 2 with a 43.7% total black population and District 4 with a 34.9% total black population). The one-man, one-vote issue is now moot except as it might relate to the question of ordering special elections.

The 1991 Lawrence County Redistricting Plan, which was pre-cleared by the Justice Department on August 10, 1992, is constituted as follows:

| DISTRICT | TOTAL POPULATION | BLACK POPULATION | PERCENTAGE BLACK POPULATION |
|---|---|---|---|
| 1 | 2658 | 441 | 16.6% |
| 2 | 2442 | 1066 | 43.7% |
| 3 | 2413 | 162 | 6.7% |
| 4 | 2425 | 847 | 34.9% |
| 5 | 2520 | 1642 | 65.2% |
| TOTALS | 12,458 | 4158 | 33.4% |

The black population in District 5 was increased from 54.4% to 65.2%. This in-

crease in the black population of District 5 was in response to a request from minority

---

**1.** On November 24, 1992, the Bi–Racial Committee submitted its report to the Court. This report reflected that on November 18, 1992, a Motion was made as follows: "Accept the 65% BVAP for District 5, accept the Justice Court district drawn by Board of Supervisors, dated November 1, 1991, and increase District 2 to a 50% BVAP,

and to recommend *not* to have a special election." The vote on that Motion was seven for and four against. The Court notes that four blacks and three whites voted for the Motion and three whites and one black voted against the Motion with one black not voting.

voters. Some minority voters at one point requested that this district be increased to 70% or more. On other occasions some black citizens requested that two black majority districts be created. The Board of Supervisors considered these requests along with other considerations taken into account in redistricting and developed the plan submitted to the Justice Department on August 26, 1991. It is to be noted that redistricting was occurring while the 1991 election campaigns were taking place.

Although Lawrence County submitted a redistricting plan for the Board of Supervisors and Election Commission districts, as set out above, it has not submitted a new plan to the Justice Department in regard to the two Justice Court districts. Thus, the 1984 Plan is challenged in regard to Justice Court districts. The 1990 Census shows that the Justice Court districts, as pre-cleared and agreed upon in 1984, have black/white populations as follows:

| Dist. | Tot. Pop. | White Pop. | % of White Population | Other & Black Pop. | % of Other & Black Population |
|-------|-----------|------------|----------------------|--------------------|-------------------------------|
| North | 5998 | 3356 | 56.0% | 2642 | 44.0% |
| South | 6460 | 4944 | 76.5% | 1516 | 23.5% |
| Total | 12,458 | 8300 | 66.6 | 4158 | 33.4% |

## COMPACTNESS

■ The Plaintiffs contend even though the 1991 Plan has been pre-cleared that nevertheless it violates the "results test" of Section 2 of the Voting Rights Act. The first question presented to this Court is does the 1991 Plan pre-cleared by the Justice Department violate Section 2 of the Voting Rights Act? Although the Defendants obtained pre-clearance, such pre-clearance does not preclude the Plaintiffs from challenging the Plan under Section 2. *Gunn v. Chickasaw County, Mississippi*, 705 F.Supp. 315, 321 (N.D.Miss.1989); *Martin v. Allain*, 658 F.Supp. 1183, 1200 (S.D.Miss.1987). This is true even though the Attorney General could have withheld Section 5 pre-clearance if he had found that such redistricting plan constituted a clear violation of Section 2. *See* 28 C.F.R. § 51.55(b)(2) (1990).

■ According to *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), three necessary preconditions must be met for the Plaintiffs to prevail in a Section 2 Voting Rights claim:

(1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district;

(2) that the minority group is politically cohesive; and

(3) that a bloc-voting white majority usually defeats the minority's preferred candidate.

*Id.* at 50–51, 106 S.Ct. at 2766. The Court finds that even though the Plaintiffs presented sufficient evidence to satisfy the second and third preconditions of *Thornburg*,[2] the Plaintiffs failed to satisfy the first precondition that must be met for a Section 2 claim.

According to evidence presented at trial and more specifically, Plaintiffs' Exhibit P–36, the Court finds that although the minority population of Lawrence County may be sufficiently large enough, it is not geographically compact enough, to constitute a majori-

---

**2.** The Court finds political cohesiveness and block-voting even though the record reflects that a number of black voters voted for the white candidate who won the District 5 supervisory race in 1991. Mitchell Barnes, a black candidate, was elected to the Board of Education from this same District 5 under the 1984 Plan even though the black majority at that time was only approximately 54.4%. The Court also takes no-tice that one of the Plaintiffs, Eugene Bryant, was elected to the Board of Education for Lawrence County in the election held on November 3, 1992, in District 2, which has a 57% majority white population. Sporadic success of black candidates does not defeat a finding of bloc-voting. The fact that black voters on occasion vote for a white candidate does not defeat a finding of political cohesiveness.

ty in two single-member supervisory districts. As seen in P–36, the minority population of Lawrence County is dispersed throughout the county. Therefore, the Court finds that there is only enough minority population sufficiently large and geographically compact to constitute a majority in one single-member district.

The proposed Plan as set forth by the Plaintiffs, which shows two single-member supervisory districts with black majorities, is drawn to maximize black voting as testified to by the Plaintiffs' experts and is directly based on the proportion of the minority population. The Plaintiffs' experts testified that the criteria which they used in drafting the Plaintiffs' plan was to maximize the black voting strength and to create two black districts. They did this without regard to natural geographic boundaries, splitting of precincts, and apparently with no other consideration other than maximizing the black voting strength. There was testimony that black voters were split on whether they wanted their communities divided in this manner.

The Defendants submitted testimony that the Plaintiffs' plan would significantly divide different communities of interest, split numerous precincts and create a difficult situation in certain areas because beat lines would cross the Pearl River at places where there are no bridges and thus, would require road equipment to traverse considerable distances through other beats to get on the other side of the river. Lawrence County operates under a beat system whereby each supervisor has a road crew and separate machinery to maintain the roads in his or her beat.

As shown in Plaintiffs' Exhibit P–16 and P–36, the Plaintiffs' proposed supervisory plan does not reflect reasonably compact districts. District 3 is an odd contortion of a district which reaches down to get a pocket of white voters in the south-east-central part of the county and then curves around to the west and then back to the north-east corner of the county crossing the Pearl River in at least one point where there are no bridges. *See* P–16. District 3 represents a distorted district where beat lines are twisted in an attempt to make that a district of almost all

white voters. *Id.* District 1 and 2 do the same thing to capture black voters within those districts, although these district lines are not as distorted. *Id.* District 2 also crosses the Pearl River at a point where there are no bridges.

The Fifth Circuit recognized in *Washington v. Tensas Parish School Bd,* 819 F.2d 609, 612 (5th Cir.1987) that "in drawing constitutionally and statutorily acceptable districts, the court should adhere to considerations of 'compactness, contiguousness and the preservation of boundaries,' and the court should not post as its primary goal 'racially balanced representation.'"

Furthermore other courts have recognized that districts should be reasonably compact and contiguous. For example, in *Jeffers v. Clinton,* 730 F.Supp. 196, 217 (E.D.Ark. 1989), *order aff'd,* 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991) the court recognized that in drawing lines for new districts the lines should be drawn "so as to make them reasonably compact and contiguous." *See also Burton v. Sheheen,* 793 F.Supp. 1329 (D.S.C.1992) (districts should be reasonably compact and contiguous); *Watkins v. Mabus,* 771 F.Supp. 789 (S.D.Miss.1991).

In *Gunn v. Chickasaw County, Mississippi,* 705 F.Supp. 315, 322 (N.D.Miss.) (1989), the court, in considering the plan submitted by the plaintiffs in that case, said:

> The court may not, under *Warren County,* make a determination that a plan which has not been given Section 5 preclearance is valid under Section 2;
>
> ... Unlike plaintiffs' proposal, a suitable plan would not be unnecessarily disruptive, and would comport, where possible, with the county's legitimate aims. It must be borne in mind that supervisory districts are more than mere compilations of population data; plaintiffs plan competently considered the figures. Plaintiffs did not consider, however, in drafting that plan, such elements as avoidance of disruption of present taxing districts, voting precincts, and polling places. Nor did the plaintiffs consider the effect of the proposed boundaries on cohesive neighborhoods. These are factors which take on importance to

the people who make up the supervisory districts.

The Plaintiffs have taken the position that since the total black population of Lawrence County is 33.4% that this population can be divided in such a way that they can have a majority in two districts and that they are entitled to this. Thus, this Court is directly confronted with the question, does Section 2 of the Voting Rights Act require a legislative body to affirmatively gerrymander districts so as to maximize minority voting? Put another way, does a legislative body have to draw lines in a distorted way, so as to create as many black majority districts as possible? This Court thinks the answer to both questions is no.

The Plaintiffs seemingly argue that in any situation where the minority population exceeds 30%, they are entitled to two districts in which the minority population comprises a majority. This Court does not so interpret Section 2 of the Voting Rights Act. If the black population of Lawrence County was 40% (rather than 33.4%) and if Section 2 required proportionate representation, then without doubt the Plaintiffs would be correct. The Plaintiffs' argument, however, goes even further. They argue that once the black population exceeds 30% then such black population can then be clustered so as to create two districts with a black majority. Consequently, this would produce representation even beyond proportionate representation.

Section 2 of the Voting Rights Act does not guarantee minority representation even in direct proportion to the minority percentage of the population, rather it specifically excludes such a guarantee of proportionate representation. *See* 42 U.S.C. § 1973 (West Supp.1992) ("Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). In addressing this issue the court in *Ewing v. Monroe County, Mississippi,* said:

> The court is fully aware that, as stated in amended Section 2, there is no right to proportional representation and that it is denial of an *equal opportunity* (emphasis added) to elect preferred candidates that is prohibited.

740 F.Supp. 417, 425 (N.D.Miss.1990) (citations omitted).

Since the three preconditions, set forth in *Thornburg v. Gingles, supra,* are not met to establish a Section 2 Voting Rights Act claim, the Court did not "evaluate the 'totality of the circumstances.'" *East Jefferson Coalition v. Parish of Jefferson,* 926 F.2d 487, 491 (5th Cir.1991).

If you do not have a group "sufficiently large and geographically compact to constitute a majority" there can be no dilution. The Plaintiffs did not prove dilution because they did not prove that they were sufficiently compact to constitute a second majority district.

The Court has already noted the Plaintiffs' argument in this case is that the lines could be drawn in such a way as to segregate the black voters primarily into two districts even though these lines would be distorted and the districts not reasonably compact. This would reduce the influence of black voters in the remaining three districts which would be overwhelmingly white. There seems to be strong argument today, from some quarters, that courts should gerrymander districts so that black voters are segregated into certain districts and white voters are segregated into other districts. The Plaintiffs' experts testified concerning racial polarization which the Court finds to be present in Lawrence County. Such an affirmative segregation of voters in Lawrence County would, in the opinion of this Court, further polarize voters and ultimately reduce the effective influence of black voters (with one clear majority district, theoretically, black voters control that district and have substantial influence in two other beats; if black voters are segregated into two districts, they would control elections for two supervisors but have little or no influence with the remaining three supervisors because they would have so few votes in those beats). Although, in the opinion of this Court, that is not a good result, nevertheless, that is not the criteria by which this Plan is to be evaluated. Judicial deference must be given to legislative judgment. When a proposed legislative plan is not unconstitutional or other-

wise in violation of federal law, the legislative plan may not be disregarded even though it may not be the optimum choice.[3] *See Seastrunk v. Burns,* 772 F.2d 143, 151 (5th Cir. 1985). In *Wright v. City of Houston, Miss.,* 806 F.2d 634 (5th Cir.1986), the Fifth Circuit stated it thusly:

> [W]e recognize that the district court is not required to choose what might be considered to be the "superior" plan. If the local government plan is found not to violate statutory provisions or the Constitution, the Supreme Court has held that the district court must accept such a plan.

*Id.* at 635 (citations omitted).

The Fifth Circuit also stated in *Wallace v. House,* 515 F.2d 619 (1975):

> [T]he particular difficulty in dilution cases is that the factors to be weighed are often political in nature, and everything in our political learning teaches us that legislatures are better equipped than courts to balance all of the competing interests involved in legislative apportionment, unless the legislature's balancing is so fundamentally unfair as to be unconstitutional.

*Id.* at 635 (citations omitted).

The Court finds that the evidence presented at trial failed to establish a Section 2 violation as to the Defendants' 1991 Plan pre-cleared by the Justice Department, put into effect in the November 1992 elections for Election Commissioners and which will be used in future elections for supervisors. *See* Defendants' Exhibit D–1.

## SPECIAL ELECTIONS

The next question presented to the Court is whether the five supervisors elected for four years in 1991 should have their terms shortened and new elections held in the five supervisory districts?[4] Supervisors elected in 1991 were elected under a plan that was agreed to in 1984 by the then parties to a voting rights action. This 1984 Plan was pre-cleared by Justice. As already noted, evidence in this case indicates that some black voters in Lawrence County requested the Board of Supervisors, in 1991, to create a 70% or more black majority district in District 5. There was a request for two black majority districts. The Board of Supervisors increased the black population in District 5 by more than 10% and adopted a plan with a 65.2% black majority district and two other impact districts with black populations of 43.7% and 34.9%. Although the Board of Supervisors in this case did not do everything they were asked to do by some black voters, they were responsive at least in part.

After receiving census data, the Defendants had to analyze same and draw maps. They had to balance competing interests and take into account other valid considerations in regard to redistricting. They had to prepare materials to submit to the Justice Department under the Voting Rights Act. All of this took time. The Board submitted the Plan to the Justice Department for approval, however, it was not pre-cleared in time to be implemented for the regular elections held every four years (in 1991).

As to the one-man, one-vote claim, according to the 1990 Census, the 1984 Pre-cleared Compromise Plan had a total deviation of 23.32%. Consequently, the question of special elections is framed in regard to alleged violations of both Section 2 and the one-man, one-vote principle.

---

3. The responsibility of this Court is to see that the Plan in effect does not deny or abridge the right of any citizen to vote on account of race or color and that minority groups have an equal opportunity to "participate in the political process and to elect representatives of their choice." If the Court determines that is accomplished by the existing Plan, the Court has no further responsibility and cannot intrude into legislative matters. Conversely, if such a plan does deny minority voters of their right to "participate in the political process and to elect representatives of their choice" then the Court has a duty to intrude and should do so without hesitation.

4. *See Fairley v. Forrest County, Mississippi,* 814 F.Supp. 1327 for an opinion rendered by this Court on the 23rd day of February, 1993, which more thoroughly discusses this question. The *Fairley* decision involves only one-man, one-vote and did not involve Section 2 of the Voting Rights Act as does this case. However, many of the considerations are the same. The citizens of political subdivisions have an interest in continuity in government. They have an interest in seeing their tax dollars spent as efficiently as possible. They have an interest in not having repeat elections unless necessary.

In *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court pointed out that legislative reapportionment is primarily for legislative consideration and stated that judicial relief would only be appropriate when a legislative body fails to reapportion "in a timely fashion *after having had an adequate opportunity to do so." Id.* at 586, 84 S.Ct. at 1394 (emphasis added). This Court finds that the Lawrence County Board of Supervisors redistricted itself in a "timely fashion." They had to have "an adequate opportunity to do so." They did not have an adequate opportunity to do so in time for the 1991 regular elections. Judicial obtrusion into what is traditionally a legislative matter should be no more than is necessary in order to protect constitutional rights. Courts should be cautious and restrained as the Fifth Circuit said in *Chisom v. Roemer,* 853 F.2d 1186, '1189 (5th Cir. 1988): "But, 'intervention by the federal courts in state elections has always been a serious business,' *Oden v. Brittain,* 396 U.S. 1210, 90 S.Ct. 4, 24 L.Ed.2d 32 (1969) (Black, J., opinion in chambers), not to be lightly engaged in."

The question before this Court, in regard to special elections, is how long should a legislative body have to redistrict after decennial census information becomes available. Although this Court has not found where the United States Supreme Court or the Fifth Circuit Court of Appeals have addressed this specific issue, two other circuits have addressed this same question. The Seventh Circuit recently considered this question in *Ramos v. Illinois,* 781 F.Supp. 1353 (N.D.Ill. 1992), *aff'd,* 976 F.2d 335 (7th Cir.1992):

> *Redistricting is complex; obtaining new census data is merely the first step* toward developing and approving a new map for the City. Therefore, the critical question is whether the 1991 election, which was based on a ward map approved in 1985 using 1980 census data, was valid under *Reynolds? Reynolds'* explicit language concerning the probably 'imbalance' in the map toward the end of the decennial period demonstrates that Chicago's 1991 election represents no constitutional violation. We hold that the district court properly dismissed the plaintiff's constitutional

claims for a failure to state a claim upon which relief may be granted.

976 F.2d at 340 (emphasis added).

The four-year terms that Chicago alderman serve merely indicate that every fifth election (i.e. when the election year fails on the same year that the new census data becomes available) likely will result in a four-year delay in using the new census data. But this simple consequence of the two different schedules (i.e. census every ten years, elections every four) does not diminish the voting power of any protected minority; there is merely a four-year time lag that occurs every other decade between redistricting and elections.

*Id.* at 341. This ruling was made in spite of the claim:

> ... that Hispanics constitute a majority in six wards. Under the 1985 plan, there currently are only four Hispanic alderman in Chicago's City Council. The plaintiffs assert that a map based on the new census figures will enable voters to elect at least two additional Hispanic alderman.... The PACI plaintiffs alleged that studies of the new census figures showed that the 1985 map fractured and diluted African–American voting strength.

*Id.* at 338. The Court continued:

> ... Illinois' redistricting scheme, as implemented in the 1991 elections, violated neither constitutional requirements nor the Voting Rights Act.

*Id.*

The Sixth Circuit reached a similar conclusion in *French v. Boner,* 786 F.Supp. 1328 (M.D.Tenn.1992), *aff'd,* 963 F.2d 890, 891 (6th Cir.1992). The Court in that case held:

> The question before us is whether the City has a constitutional duty to rerun the elections held just after the new decennial census data became available in 1991 but before the old apportionment plan could be changed and a new one put into effect prior to the impending election.
>
> ... In any system of representative government, it is inevitable that some elections for four-year or longer terms will occur on the cusp of the decennial census.

The terms inevitably will last well into the next decade; and, depending on shifts in population in the preceding decade, the representation may be unequal in the sense that the districts no longer meet a one-person, one-vote test under the new census.

... The principles of mathematical equality and majority rule are important, but we should not allow them to outweigh all other factors in reviewing the time of elections.

... We do not believe that considerations of mathematical equality in representation or the presumption in favor of redistricting every ten years outweigh the considerations outlined above concerning the validity of four-year terms, the settled expectations of voters and elected officials, the costs of the elections, and the need for stability and continuity of office.

*Id.* at 891–92.

In the *French* case when the 1991 elections were held, one district contained almost three times as many people as did another district. The total deviation between districts was 119.78%. *See Fairley* Opinion, *supra*, 814 F.Supp. at 1341. That is a far cry from the 23.32% involved in this case.

■ This Court is of the opinion that when a political body is operating under a constitutional plan (one pre-cleared by the Justice Department and not challenged in Court, or either agreed to by the parties to litigation and then pre-cleared by the Justice Department as is the situation in this case) that such body must have a reasonable time after each decennial census in order to develop another plan and have it pre-cleared by the Justice Department. Elections held under such a previously pre-cleared plan, in the year that new census data becomes available, but before redistricting can take place, should not be set aside and new elections ordered. This is especially true when population shifts as to one-man, one-vote have been so slight and the racial composition was as agreed to only seven years earlier in a compromise settlement before a federal court which compromise settlement was pre-cleared by the Justice Department.

The Court notes the Plaintiffs' oral argument that the Defendants, in their pleadings, did not deny the Plaintiffs' allegations that special elections should be held. However, the part of the Defendants' pleadings cited by counsel for the Plaintiffs during oral arguments was in the Defendants' Answer to the Plaintiffs' Original Complaint. But, in the Defendants' Amended Answer to the Plaintiffs' First Amended Complaint, the Defendants denied that the Plaintiffs were entitled to special elections. It was this amended complaint which was tried before this Court.

## WAIVER

Based on the foregoing, this Court does not reach the question of waiver. *See Tucker v. Burford,* 603 F.Supp. 276 (N.D.Miss.1985).

## JUSTICE COURT DISTRICTS

■ Lawrence County did not reapportion its Justice Court districts after the 1990 Census. The Court finds as to the Justice Court districts, the Plaintiffs met their burden in establishing the three preconditions of the *Thornburg* case, *supra.*

The Court finds that the 1984 Justice Court Districts Plan does violate Section 2 of the Voting Rights Act. The Court is of the opinion that a reasonably compact Justice Court district with a black majority can be created by dividing Lawrence County east and west rather than north and south so that the black votes are not diluted. Having found that the Plaintiffs have met their burden in regard to the three preconditions under *Thornburg,* the Court further finds that "under the totality of the circumstances," the Plaintiffs have met their burden of proof. The Defendants are directed to submit to the Justice Department in a reasonably expeditious manner the Justice Court Districts Plan, prepared by the County on November 2, 1991, and unanimously approved by the Bi–Racial Committee.

## CONCLUSION

The Court finds that the 1991 Plan for Redistricting of the Lawrence County Board of Supervisors and Election Commissioners Districts pre-cleared by the Justice Depart-

ment on the 10th day of August, 1992, does not violate Section 2 of the Voting Rights Act. That portion of the Plaintiffs' Amended Complaint alleging Section 2 violation as to these districts will be dismissed with prejudice. That part of the complaint requesting special elections for supervisors will likewise be dismissed with prejudice. The Defendants are to submit the Justice Court Districts Plan to the Justice Department as ordered above. This Court will retain jurisdiction of this matter pending submission of the Justice Court Districts Plan to the Justice Department for pre-clearance and the determination thereof. A judgment will be entered accordingly.

SO ORDERED AND ADJUDGED.

### JUDGMENT

This cause having been tried to conclusion on its merits before the Court, and the Court having duly entered its Memorandum Opinion and Order containing its Findings of Fact and Conclusions of Law;

It is Ordered and Adjudged:

That the 1991 Plan for Redistricting of the Lawrence County Board of Supervisors and Election Commissioners Districts pre-cleared by the Justice Department on the 10th day of August, 1992, does not violate Section 2 of the Voting Rights Act. That portion of the Plaintiffs' Amended Complaint alleging Section 2 violation as to these districts will be dismissed with prejudice. That part of the complaint requesting special elections for supervisors will likewise be dismissed with prejudice. The Defendants are to submit the Justice Court Districts Plan to the Justice Department as ordered above. This Court will retain jurisdiction of this matter pending submission of the Justice Court Districts Plan to the Justice Department for pre-clearance and the determination thereof.

SO ORDERED AND ADJUDGED.