122

Eugene BRYANT, Lenza Williams, Edgar Bridges, Alton Bridges, Gene Alexander, James W. Hill, Sr., Plaintiffs,

v.

LAWRENCE COUNTY, MISSISSIPPI, Lawrence County Democratic Executive Committee, By and Through its Chairperson, Harold Dennison, Lawrence County Republican Executive Committee, By and Through its Chairperson, Benson B. Carr, Lawrence County Election Commission, By and Through its Chairperson, Lorain Smith, Defendants.

Civ. A. No. 2:91cv152PN.

United States District Court, S.D. Mississippi; Hattiesburg Division.

Feb. 13, 1995.

Ellis Turnage, Cleveland, MS, for Eugene Bryant, Lenza Williams, Edgar Bridges, Alton Bridges, Gene Alexander, James W. Hill, Sr.

Dennis L. Horn, Horn & Payne, Jackson, MS, Malcolm T. Rogers, Monticello, MS, for Lawrence County Miss., Lawrence County Election Com'n By and Through its Chairperson, Lorain Smith.

Dennis L. Horn, Horn & Payne, Jackson, MS, Robert Glenn Turnage, Turnage & Turnage, Monticello, MS, for Lawrence County Democratic Executive Committee, By and Through its Chairperson, Harold Dennison.

Dennis L. Horn, Horn & Payne, Jackson, MS, for Lawrence County Republican Execu-

tive Committee, By and Through its Chairperson, Benson. B. Carr.

Lawrence County Republican Executive Committee, By and Through its Chairperson, Benson B. Carr, pro se.

## MEMORANDUM OPINION AND ORDER

PICKERING, District Judge.

This matter is before this Court on Plaintiffs' Motion for a New Trial, for Reconsideration or for Rehearing on the Issue of Compactness relative to an Order of this Court entered on March 3, 1993, 814 F.Supp. 1346. At trial, Plaintiffs sought to have Defendants' 1991 redistricting plan for supervisors in Lawrence County declared to be in violation of § 2 of the Voting Rights Act, to have the terms of the supervisors elected in 1991 shortened and new elections ordered, and to have Defendants' 1984 justice court districts declared to be in violation of § 2 of the Voting Rights Act. After presiding over a two-day bench trial, this Court entered an Order denying Plaintiffs' claims in regard to the 1991 redistricting plan for supervisors, denying special elections, but finding that Defendants' 1984 justice court districts were violative of § 2. This Court directed Defendants to submit a revised justice court districts plan to the Justice Department for approval under § 5 of the Voting Rights Act, and retained jurisdiction pending submission of the justice court districts plan to the Justice Department. The justice court plan has since been precleared by the Justice Department but has not been submitted to this Court for approval.

■ On May 24, 1994, the Fifth Circuit handed down a decision in the case of *Clark v. Calhoun County, Miss.*, 21 F.3d 92 (5th Cir.1994). Subsequently on August 8, 1994, and primarily based on *Clark*, Plaintiffs filed their Motion seeking a new trial, reconsideration, or rehearing. Since no final judgment has been entered, this Motion is timely. The facts of this case and this Court's reasoning for the judgment previously entered in this matter are fully set out in this Court's Mem-

orandum Opinion and Order found at *Bryant v. Lawrence Co.*, 814 F.Supp. 1346 (S.D.Miss. 1993).[1] This Court does not feel it necessary to recite the facts cited in the previous Opinion or to reiterate the reasons that this Court utilized in arriving at its previous decision.

However, this Court does feel it appropriate to discuss this case in light of *Clark, supra, Shaw v. Reno,* —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), and *Johnson v. De Grandy,* —— U.S. ——, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994), all decided subsequent to this Court's previous opinion. The Fifth Circuit *Clark* case was decided after the Supreme Court's decision in *Shaw* but before the Supreme Court's decision in *Johnson.*

■ In its previous opinion this Court posed the question presented in this case in the following manner: "does § 2 of the Voting Rights Act require a legislative body to affirmatively gerrymander districts so as to *maximize* minority voting? Put another way, does a legislative body have to draw lines in a distorted way, so as to create as many black majority districts as possible?" 814 F.Supp. at 1351 (emphasis added.) This Court answered that question no. Since that time the Supreme Court has faced the same question and given the same answer. "Failure to maximize cannot be the measure of § 2." —— U.S. at ——, 114 S.Ct. at 2660, 129 L.Ed.2d at 794. Justice O'Connor in a concurring opinion made the point even more explicit. "The critical issue in this case is whether § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 [42 U.S.C. § 1973], requires courts to 'maximize' the number of districts in which minority voters may elect their candidates of choice ... The court today makes clear ... that the Voting Rights Act does not require maximization." *Id.* at ——, 114 S.Ct. at 2664, 129 L.Ed.2d at 799. "[T]he Court makes clear that § 2 does not require maximization of minority voting strength." *Id.* at ——, 114 S.Ct. at 2664, 129 L.Ed.2d at 800.

---

1. The holding of this case is misstated in the synopsis at the beginning of the Opinion. *See Bryant v. Lawrence Co.*, 814 F.Supp. 1346, 1346 (S.D.Miss.1993). The synopsis states that this

Court held that the Lawrence County supervisory district plan violated § 2. As stated above, this Court found that Plaintiffs had not proven that the supervisory district plan violated § 2.

The Court in *Johnson* reversed the District Court holding "In sum, the District Court's finding of dilution . . . reflected . . . a misconstruction of § 2 that equated dilution with failure to maximize the number of reasonably compact majority-minority districts." *Id.* at ——, 114 S.Ct. at 2662, 129 L.Ed.2d at 798. Although the decision in *Johnson* was not unanimous, all judges were unanimous in their disagreement with the District Court's holding that § 2 requires maximization of minority-majority districts.

This case is easily distinguishable from the *Clark* case. *Clark* involved a situation in which the black voters of Calhoun County constituted 23.47% of the population, but did not then and had never had a black majority supervisors district. In the case now before this Court, Lawrence County has a total black population of 33.4% and does have a black majority district with a 65.2% black population.

■ In 1984, as the result of a federal lawsuit, Lawrence County adopted a plan which was precleared by justice and approved by this Court in which one majority black district was created. It was thought at that time that the black majority district had a black population of 57.9%. It turned out that the black majority district only had a total black population of approximately 54.4%. With a black population of 54.4% in District 5, black voters failed to elect a black candidate to the position of supervisor. When the county commenced the process of redistricting in 1991, testimony at trial established that some black voters wished to increase the black majority in District 5 so as to make it easier to elect a black candidate, while other black voters wished to create two majority black districts. The Lawrence County Board of Supervisors took these conflicting views into consideration and increased the total black population in District 5 by more than ten percent from 54.4% to 65.2% and created two impact districts (i.e., District 2 with a 43.7% total black population and District 4 with a 34.9% total black population). Who is to say that the black voters who wanted to increase the total black population in Beat 5 so that they would have a

surer chance of electing a black supervisor, were wrong, and that those black voters who wanted to create two black majority districts with smaller black populations and perhaps not elect any black supervisors, were right? Plaintiffs would have this Court make that decision. Political bodies are peculiarly qualified to make this type of decision, not courts. Federal courts should intrude into legislative redistricting only to the extent necessary to protect constitutional rights, not because one plan is better than another. *Fairley v. Forrest Co.*, 814 F.Supp. 1327, 1346 (S.D.Miss. 1993).

■ Since Mississippi counties operate with five districts for supervisors, an ideal district will have 20% of the total population of a county within its boundaries. Since black voters in Calhoun County constitute 23.47% of the population, it is much easier to establish the fact that a plan which does not give them a single black majority district is violative of § 2 than in the case now before this Court. Plaintiffs contend that because Lawrence County has a black population of 33.4%, they are entitled to two black majority districts, based on nothing except race. The language of § 2 specifically denies that this section is intended to require proportional representation. Plaintiffs contend that they are entitled to black majority districts that exceed their proportion of the total population.

Plaintiffs argue that this Court's previous opinion in this case is in conflict with the *Clark* decision in two particulars. The first particular deals with the issue of compactness or the first *Gingles* [2] precondition. It is true that the Fifth Circuit in *Clark* remanded that case to the district court "because the district court's findings as to the first *Gingles* precondition [were] not sufficiently particularized." *Clark*, 21 F.3d at 97. It is also true that this Court in its previous opinion made a specific finding that plaintiffs had failed to satisfy the first *Gingles* precondition in that plaintiffs failed to prove that the black population of Lawrence County was "geographically compact enough to constitute a majority in two single member supervisory

**2.** *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

districts." *Bryant v. Lawrence Co.*, 814 F.Supp. 1346 (S.D.Miss.1993). As previously pointed out, statistical data alone demonstrates that there is a vast difference in this case and the *Clark* case. Being entitled under § 2, to *a* black majority district in a county with a total black population of 23.47%[3] (ideally 20% of the voters are entitled to elect one supervisor) does not per se translate into a black minority being entitled to two black majority districts in a county with a total black population of 33.4%. Holding that § 2 requires the creation of two black majority districts in this case would be tantamount to holding that 16.7% of the voters (33.4 ÷ 2) are automatically entitled to elect a supervisor of their own race. This Court does not interpret *Clark* to so hold and *Johnson*, as previously indicated, answers the question negatively. *Johnson*, — U.S. at — – —, 114 S.Ct. at 2659–60, 129 L.Ed.2d at 794.

Again, the *Clark* case was reversed because "the district court's findings as to the first *Gingles* pre-condition [were] not sufficiently particularized." *Clark*, 21 F.3d at 97. In addition to the statistical differences already pointed out between this case and *Clark*, this Court in its previous opinion gave particularized reasons as to why plaintiffs in this case failed to meet their burden of proof on the "compactness" issue. Since those reasons are set out in this Court's previous opinion, this Court will not here reiterate those particularized reasons.

It is true that compactness is not a constitutional requirement. *Shaw*, — U.S. at — – —, 113 S.Ct. at 2826–27, 125 L.Ed.2d at 528. However, compactness is a requirement in proving a § 2 violation. There is a distinction between challenging a legislative plan by claiming that it is constitutionally deficient because of a lack of compactness under the Equal Protection Clause (*see Shaw, supra*), and Plaintiffs' burden under § 2 to demonstrate the first *Gingles*

precondition that the minority group "is sufficiently large and geographically compact to constitute a majority in a single member district." *Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766, 92 L.Ed.2d at 46. (In this case it would be demonstrating that the black minority is "sufficiently large and geographically compact to constitute a majority" in two single member districts.) *Gingles* is the benchmark case establishing what must be proven in order to establish a § 2 violation. Since the *Gingles* decision was decided, this first precondition (sufficiently large and geographically compact) has been explained and further defined in numerous cases, but it has not been eliminated. The first *Gingles* precondition is still the law.[4]

The Supreme Court in *Shaw* reaffirmed the appropriateness of considering compactness in legislative redistricting. The *Shaw* court stated, "[t]he district lines may be drawn, for example, to provide for compact districts of contiguous territory, or to maintain the integrity, of political subdivisions." *Shaw*, — U.S. at —, 113 S.Ct. at 2826, 125 L.Ed.2d at 528. The Court then criticized redistricting that disregards "traditional districting principles such as compactness, contiguity, and respect for political subdivisions. We emphasize that these criteria are important...." *Id.* The Court further stated " '[W]e think it ... permissible for a State, employing sound districting principles such as compactness ...' " *Id.* at —, 113 S.Ct. at 2829, 125 L.Ed.2d at 531–32 (quoting *United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977)). In *Johnson*, the Court referred to "reasonably compact majority-minority districts." *Johnson*, — U.S. at —, 114 S.Ct. at 2662, 129 L.Ed.2d at 798.

The *Johnson* decision introduces a new term "proportionality" into the redistricting formula and defines the term as follows: " 'Proportionality' as the term is used here links the number of majority-minority voting

---

**3.** An analysis of controlling case law clearly indicates that a county having a black majority population in excess of twenty percent with no black majority district is going to have a difficult time squaring such a disparity with § 2. Consequently, compactness in such a situation may not be as important, as indicated by *Clark, supra*.

**4.** Even if the three preconditions of *Gingles* are met a plan may be found not to violate § 2 because of the "totality of the circumstances." *Johnson*, — U.S. at —, 114 S.Ct. at 2657–59, 129 L.Ed.2d at 791–93.

districts to minority members' share of the relevant population. The concept is distinct from the subject of the proportional representation clause of § 2 which provides that 'nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.'" *Johnson,* —— U.S. at —— n. 11, 114 S.Ct. at 2658, n. 11, 129 L.Ed.2d at 792–93 n. 11.

Although holding that § 2 does not require maximization .of minority voting strength, *Johnson* also held that proportional representation does not guarantee compliance with § 2. "An inflexible rule would run counter to the textural command of § 2, that the presence or absence of a violation be assessed 'based on the totality of circumstances.'" (citation omitted.) *Id.* at ——, 114 S.Ct. at 2660, 125 L.Ed.2d at 795.

The Court held that proving all three *Gingles* preconditions does not automatically establish a § 2 violation, but the trial court must also consider the "totality of circumstances." —— U.S. at ——, 114 S.Ct. at 2657, 125 L.Ed.2d at 791 and referenced the Senate Report to the 1982 Amendment to § 2 of the Voting Rights Act for the factors to be considered under the "totality of circumstances." *See* fn. 9, —— U.S. at ——, 114 S.Ct. at 2656, 129 L.Ed.2d at 790.

The *Johnson* Court found "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." fn. 11 . *Id.* at ——, 114 S.Ct. at 2658, 129 L.Ed.2d at 793. The Court repeated numerous times that the focus of § 2 is on "equal political and electoral opportunity." *Id.* at ——–——, ——–——, ——–——, 114 S.Ct. at 2658–59, 2660–61, 2661–62, 129 L.Ed.2d at 793,. 796, 797.

Plaintiffs have the burden of proving a violation of § 2. Nothing in the record indicates to this Court that minority voters in Lawrence County under the plan before this Court do not have "equal political and electoral opportunity" with all other voters.

*Johnson* makes it clear that minority voters may be entitled to two minority-majority districts in a case such as this, with a total black population of 33.4%, if they prove dilution. In other words, if Plaintiffs had established that the present plan before this Court was drawn in such a way as to dilute the influence of black voters, deliberately or unintentionally, they would be entitled to prevail. If they had demonstrated that black communities were divided, or that pockets of black voters were excluded from a certain district, or that in some other way lines had been drawn to keep from creating a second black district that could have been reasonably created, they could have established a § 2 violation. But that was not the approach that Plaintiffs took. They contend that simply because they constitute more than 30% of the population they are per se entitled to two minority-majority districts. They seek an affirmative gerrymander. Plaintiffs presented their case at trial simply under the maximization theory. They failed to prove a § 2 violation.

The second particular in which Plaintiffs contend that this Court's previous order is in conflict with *Clark* has to do with this Court's recognition that by arbitrarily segregating the black voters "primarily into two districts" the influence of black voters in the remaining three · districts, which are overwhelmingly white, would be diminished. *Bryant,* 814 . F.Supp. at 1351. This Court went on to say, "such an affirmative segregation of voters in Lawrence County would, in the opinion of this Court, further polarize voters and ultimately reduce the effective influence of black voters. . . ." *Id.* at 1351. What the Plaintiffs do not point out is that this Court went further to state, "[a]lthough, in the opinion of this Court, that is not a good result, nevertheless, that is not the criteria by which this plan is to be evaluated." As stated in its previous opinion, this Court did not rely on the above statement in arriving at its conclusion concerning the geographic compactness of Plaintiffs' two· proposed majority black districts.

Speaking for the majority in *Shaw,* Justice O'Connor shared some of the same concerns as voiced by this Court:

A racial gerrymander may exacerbate the very patterns of racial block voting that majority-minority districting is sometimes

· said to counteract.... When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representation democracy.... "That system, by whatever name it is called, is a divisive force in a community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense...."

*Shaw,* ── U.S. at ──, 113 S.Ct. at 2827, 125 L.Ed.2d at 529 (quoting *Wright v. Rockefeller,* 376 U.S. 52, 66–67, 84 S.Ct. 603, 611, 11 L.Ed.2d 512, 521 (1964) (Douglas, J., dissenting)). Justice O'Connor went on to say,

> As we have explained, however, reapportionment legislation that cannot be understood as anything other than an effort to classify and separate voters by race injures voters in other ways. It reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole.

*Id.* ── at ──, 114 S.Ct. at 2828, 125 L.Ed.2d at 530.

Justice Kennedy concurring in *Johnson* expressed reservations about implementing proportionality requirements by government action saying:

> Those governmental actions in my view, tend to entrench the very practices and stereotypes the Equal Protection Clause is set against ... As a general matter, the sorting of persons with an intent to divide by reason of race raises the most serious constitutional questions.... Racial classifications "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality" and are presumed invalid.

*Johnson,* ── U.S. at ──, 114 S.Ct. at 2666, 129 L.Ed.2d at 802 (citations omitted).

This Court is still concerned that as white voters are separated into separate districts and black voters are separated into other separate districts there is going to be less and less accommodation, less and less effort to resolve differences by reason and logic and more and more polarization. Candidates elected in majority black districts may well feel little need to accommodate the views of their minority white constituents, and candidates elected from almost exclusively white districts may well feel little responsibility to accommodate the views of their minority black constituents. Constitutional guarantees of equality should bring us together and not divide us.

Having addressed the two particulars in which Plaintiffs contend that this Court's previous opinion conflicts with *Clark* and for the reasons herein set out, as well as the reasons set out more fully in this Court's original opinion, the Motion of the Plaintiffs is denied.

SO ORDERED AND ADJUDGED.

